UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

AVATAR FOODS INC. and
TUSCANY COOKIES, LLC,

          Plaintiffs,

vs.

NEWMAN'S OWN, INC.,

          Defendant.

Case No:

# COMPLAINT

Plaintiffs Avatar Foods Inc. ("Avatar") and its subsidiary Tuscany Cookies, LLC ("Tuscany") (together with Avatar, "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against Defendant Newman's Own, Inc. ("Newman's Own" or "Defendant"), allege as follows:

## SUMMARY OF THE ACTION

1. Plaintiffs are award-winning manufacturers and distributors of natural and healthy food products that operate from an FDA-registered, 70,000-square foot facility in Henderson, Nevada. Led by CEO Diego Silva, recipient of the Specialty Food Association's 2024 Leadership Award for Vision, Plaintiffs produce a diverse portfolio of specialty brands, including Tuscany's gourmet specialty cookies.

2. Defendant is a Connecticut corporation originally founded in 1982 for the purpose of manufacturing and selling high quality food products, capitalizing on the worldwide fame of late actor and director Paul Newman, whose name, image, and likeness is utilized in the trademarks and branding of the company.

1

3.      Defendant is wholly owned by the Newman's Own Foundation ("Foundation"), which was founded to expand and preserve Mr. Newman's legacy of philanthropy.

4.      On November 1, 2024, Defendant entered into an *Amended & Restated Co-Packer Agreement* with Plaintiffs for the production and distribution of organic cream-filled sandwich cookie products ("Products") sold under the Newman's Own brand as Newman's O's.

5.      The Agreement obligated Defendant to provide Plaintiffs with product specifications ("Product Specifications") for commercially-viable Products.

6.      Unbeknownst to Plaintiffs, at the time they entered into the Agreement, Defendant's Products were plagued by large-scale production failures relating to their Product Specifications. Simply put, Defendant's Product Specifications were not machinable, meaning that the Products could not be manufactured for commercial sale per the Product Specifications.

7.      Nonetheless, Defendant falsely represented to Plaintiffs that the issues with its prior co-packer related to that co-packer's capabilities, not any deficiencies with respect to the Product Specifications.

8.      As a result, Plaintiffs entered into the Agreement, quickly discovered that the Product Specifications were not machinable, and spent months and hundreds of thousands of dollars serving as a *de facto* test kitchen for Defendant to "develop a formula" suitable for large-scale production and to use it as a blueprint for the remaining Product line.

9.      Despite their success in doing just that and delivering quality Products, accepted by Defendant, Plaintiffs have been left holding the bag, as Defendant has refused to: (i) pay Plaintiffs' outstanding invoices in the amount of $1,187,035.14; and (ii) accept delivery of an additional 19,954 cases of Product, which Plaintiff is prohibited under the terms of the Agreement from reselling.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

11. Venue is proper pursuant to 28 U.S.C. § 1391(d) because Defendant's principal place of business is within this District.

## PARTIES

12. Plaintiff Avatar is a Nevada corporation having a principal place of business in Henderson, Nevada.

13. Plaintiff Tuscany is a Nevada limited liability company having a principal place of business in Gridley, California. Tuscany is a subsidiary of Avatar.

14. Defendant Newman's Own is a Connecticut corporation having a principal place of business in Westport, Connecticut.

## FACTS COMMON TO ALL COUNTS

**The Agreement**

15. Plaintiffs and Defendant are parties to a certain *Amended & Restated Co-Packer Agreement*, effective November 1, 2024 ("Agreement").

16. The Agreement provides that it "shall be governed by and interpreted in accordance with the laws of the State of Delaware without regard to its conflicts of laws principles."

17. The parties' relationship is also governed by *Standard Terms*, dated February 26, 2024 ("Standard Terms"), which is expressly incorporated by reference into the Agreement.

18. Pursuant to Section 2.1 of the Agreement, Plaintiffs agreed to "manufacture, package, store, ship and sell the Products to Newman's Own in accordance with Applicable Laws, the requirements set forth in this Agreement, and the Finished Product Specifications."

19. The Agreement defines "Finished Product Specifications" as "the specifications and recipes for the Products, including the composition of all Packaging materials, which Newman's Own may amend from time to time in its sole discretion, including those specifications listed in Exhibit C" to the Agreement.

20. The Agreement further provides that the Products were to be produced at Plaintiffs' facility in Gridley, California.

21. This facility was expressly approved by Defendant pursuant to Section 3.2.5 of the Agreement.

22. Section 4.1 of the Agreement provides: "[Defendant] shall transmit firm purchase orders to [Plaintiffs] on an as-needed basis, and [Plaintiffs] shall confirm its acceptance of such purchase orders. Upon such acceptance by [Plaintiffs], such purchase orders shall become mutually binding orders."

23. Payment for such orders is governed by Section 4.6 of the Agreement, which provides:

> Initial payment terms will be Net 20 for EFT payments for the first 6 months, starting with the first month of sellable production. Thereafter, the terms of payment by NOI are Net 35 for EFT payments. In the event NOI disputes in good faith an invoice amount, the Parties shall work diligently for a sixty (60)-day period to resolve such dispute. Only after such efforts have been reasonably exhausted may the Parties, in their discretion, resort to any lawsuit or other legal remedy.

**Defendant's Faulty Product Specifications**

24. Before entering into the Agreement, Defendant represented to Plaintiffs that its previous large-scale production failures with respect to the Products were the result of its prior co-packer's equipment limitations, not by Defendant's own formulation.

25. Defendant repeatedly assured Plaintiffs that the products were "commercial ready."

26. On or about February 21, 2025, Defendant provided purported "Product Specifications" to Plaintiffs.

27. These materials consisted of rudimentary worksheets devoid of the industry-standard elements necessary for commercial manufacturing, including ingredient tolerances, process controls, machine settings, operating limits, sensory criteria, and acceptance/rejection metrics, despite Section 3.1 of the Agreement placing exclusive responsibility for commercially viable specifications on Defendant.

28. Without these industry-standard technical details, Plaintiffs could not reproduce the Products at scale or ensure consistency.

29. Critically, the cream formulation provided by Defendant was not machinable.

30. The specified organic palm fat possessed an improper solid-fat profile for industrial-scale processing, rendering mass production impossible on standard production equipment.

31. Plaintiffs immediately notified Defendant of this defect in writing.

32. Plaintiffs advised Defendant that it had three options: (i) absorb increased costs caused by the non-machinable formulation; (ii) transition production elsewhere; or (iii) work with Plaintiffs to develop a machinable formulation with revised pricing.

33. Defendant selected the third option.

34. As a result, from April through May 2025, Defendant used Plaintiffs' facility as its *de facto* test kitchen, directing dozens of last-minute formulation changes while attempting to engineer a commercially viable product on the fly.

35. As of May 14, 2025, Defendant's Vice President Ron Restani was still revising labels and specifications.

36. Defendant did not possess a commercially executable product when it signed the Agreement.

37. Defendant acknowledged the issue with the Product Specifications.

38. By way of example, on June 3, 2025, Defendant's representative Jeff Smith expressly directed Plaintiffs to "develop a formula" suitable for large-scale production and to use it as a blueprint for the remaining Product line.

39. On June 3, 2025, Defendant confirmed in writing that pricing for all Products was being mutually modified, acknowledging that the original cost projections were no longer commercially feasible due to formulation failures.

40. Specifically, Plaintiffs wrote to Defendant: "to move forward with production, we kindly request your confirmation on the updated pricing below:"

| Product Name | New Case Price |
|---|---|
| Original | $14.59 |
| Mint | $14.75 |
| Double Chocolate | $14.71 |
| Vanilla | $13.41 |
| Strawberry | $15.05 |

41. Mr. Smith replied that Defendant "agree[s] with the prices detailed below."

42. Defendant is bound by that agreement.

43. At Defendant's direction, Plaintiffs spent over $500,000 modifying, testing, and preparing sample batches to develop a formula for the Products compliant with large-scale manufacturing.

44. Despite the systemic formulation defects, Plaintiffs, acting in good faith, continued to accommodate Defendant's demands.

45. In July 2025, Plaintiffs tested three separate palm-oil systems to correct the root cause of the production failure while Defendant simultaneously struggled with chronic film-supply failures that repeatedly delayed production – failures confirmed in Defendant's own written communications.

46. Ultimately, on October 6, 2025, Mr. Smith confirmed in writing that the parties had mutually agreed on a wind-down in the third week of November 2025 and that Plaintiffs' obligation would be satisfied upon producing 112,000 units by November 17, 2025.

47. Defendant authorized five-day-per-week production at an added cost of $6,000 per week, which Plaintiffs performed in full.

48. Plaintiffs completed all 112,000 units precisely as directed under Defendant's ever-changing but approved specifications.

49. Plaintiffs invoiced Defendant for all Products delivered through November 17, 2025.

50. Despite Plaintiffs' compliance with their obligations under the Agreement, as amended, Plaintiff has withheld $1,187,035.14 in payment due for Products it accepted, sold, and profited from.

51. By letter dated November 13, 2025, Defendant informed Plaintiffs that, pursuant to Section 7.1 of the Agreement, it would "withhold all amounts due under any current or future outstanding invoices" based upon Defendant's fabricated assertions that Plaintiffs breached the Agreement, including by allegedly (i) "failing to meet the agreed Finished Product Specifications" – which Defendant acknowledged *in writing* to be deficient – and (ii) failing to keep costs "flat or declining" despite Defendant's written agreement to modify the Agreement's pricing provision.

52. Before November 13, 2025, Defendant never provided a single formal notice of non-conforming goods, a contractual prerequisite to any termination for cause.

53. Defendant's allegations of breach are false, pretextual, and designed to avoid its payment obligations.

54. Further, Defendant is responsible for paying for all unused inventory of raw materials and packaging in Plaintiff's possession.

55. Plaintiffs currently hold these materials, valued at $145,146.02, along with 19,954 cases of finished Product ("Additional Product"), ready for shipment, strictly for Defendant's benefit.

56. Defendant has refused to take possession of the Additional Product.

57. Plaintiffs are precluded from selling the Additional Product to a third party, to mitigate their damages, by the terms of the Agreement.

## COUNT I
## (Breach of Contract)

58. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

59. Plaintiffs and Defendant entered into a valid and enforceable contract – the Agreement – which imposed contractual obligations on Defendant.

60. By its conduct alleged above, Defendant breached its contractual obligations under the Agreement.

61. In addition, under Delaware law, every contract contains an implied covenant of good faith and fair dealing requiring the parties to the contract to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract.

62. By its conduct alleged above, Defendant has breached the implied covenant of good faith and fair dealing contained in the Agreement.

63. As a result of Defendant's breaches, Plaintiffs have incurred damages in an amount to be determined at trial, not less than $1,600,000.

## COUNT II
### (Action for the Price (Accepted Goods) – 6 Del. C. § 2-709(1)(a))

64. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

65. The Agreement constitutes a contract for the sale of goods governed by Article 2 of the Delaware Uniform Commercial Code.

66. Plaintiff performed its obligations under the Agreement and delivered goods identified to the Agreement.

67. Defendant accepted the goods and failed to pay the contract price when due.

68. As a result of Defendant's failure to pay the contract price, Plaintiff is entitled to recover the price of the goods, together with any incidental damages permitted by law.

## COUNT III
### (Action for the Price (Additional Product) – 6 Del. C. § 2-709(1)(b))

69. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

70. Plaintiff performed its obligations under the Agreement and has manufactured, and his holding, the Additional Product alleged above.

71. Defendant wrongfully refused to take delivery of the Additional Product and has failed to pay for the Additional Product.

72. The Additional Product are identified to the Agreement and were manufactured specifically for Defendant's brand.

73. Pursuant to the express terms of the Agreement, Plaintiff is prohibited from reselling the Additional Product to any third party. Accordingly, efforts to resell the goods are legally and contractually prohibited, and circumstances reasonably indicate that any effort to resell the Additional Product would be unavailing.

74. Plaintiff is holding the Additional Product for the Defendant and will continue to do so until the entry of judgment, at which point the goods will be made available to Defendant upon payment of the judgment in full.

75. As a result of Defendant's breach, Plaintiff is entitled to recover the full contract price of the Additional Product, together with incidental damages including storage and insurance costs, and pre-judgment interest, pursuant to 6 Del. C. § 2-709(1)(b).

### COUNT IV
### (In the Alternative to Count III: Damages for Non-Acceptance – 6 Del. C. § 2-708(2))

76. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

77. To the extent Plaintiff is held not to be entitled to the contract price under 6 Del. C. § 2-709, Plaintiff is entitled to damages under 6 Del. C. § 2-708 for Defendant's non-acceptance and repudiation of the Agreement.

78. Because the Additional Product was manufactured specifically for Defendant's brand and cannot be resold, the measure of damages under § 2-708(1) is inadequate to put Plaintiff in as good a position as performance would have done.

79. Pursuant to 6 Del. C. § 2-708(2), Plaintiff is entitled to recover its lost profits (including reasonable overhead) which Plaintiff would have realized from full performance by Defendant, together with any incidental damages and costs reasonably incurred.

**WHEREFORE**, Plaintiffs demand judgment as follows:

a. On Counts I, II, III, and IV, an award of compensatory and incidental damages in an amount to be determined at trial, not less than $2,000,000.

b. Awarding Plaintiffs' counsel's reasonable attorney's fees and costs; and

c. Granting such other and further relief as the Court deems appropriate.

Dated: Greenwich, CT
      January 26, 2026

                                          **LACHTMAN COHEN**
                                          **& BELOWICH LLP**

*/s/ Brian S. Cohen*

Brian S. Cohen [BC-2091]
Joanna Sandolo [JS-9187]
500 West Putnam Avenue
Suite 400
Greenwich, CT 06830
Tel: (203) 404-4960
Email: bcohen@lcb-law.com
Email: jsandolo@lcb-law.com

                - and -

1133 Westchester Avenue
Suite N-200
White Plains, NY 10604
Tel: (914) 893-4720
**Attorneys for Plaintiffs**